**PACIFIC TRIAL ATTORNEYS**
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Suite 800
Newport Beach, California 92660
Telephone: (949) 706-6464
Facsimile: (949) 706-6469

Attorneys for Plaintiff

# UNITED STATE DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONYA VALENZUELA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KEURIG GREEN MOUNTAIN, INC., a Delaware corporation d/b/a KEURIG.COM; and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No. 3:22-cv-09042-JSC<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")**<br><br>Filed: December 21, 2022 |

## I. INTRODUCTION

**Defendant Keurig Green Mountain, Inc. ("Defendant") secretly enables and allows a third-party spyware company to wiretap and eavesdrop upon the private conversations of everyone who communicates through the chat feature at www.keurig.com (the "Website"). The spyware company then exploits and monetizes that data by sharing it with other third parties, who use the private chat data to bombard the unsuspecting visitor with targeted marketing.**

**Defendant does this without visitors' informed consent. As a result, Defendant has violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 *et seq*.**

## II. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is at least minimal diversity because at least one plaintiff and Defendant are citizens of different states. Indeed, based upon the information available to Plaintiff Sonya Valenzuela ("Plaintiff"), there are believed to be at least 5,000 class members, each entitled to $5,000 in statutory damages, thus making the amount in controversy at least $25,000,0000 exclusive of interests and costs. *See* Cal. Penal Code § 637.2(a)(1).

2. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

3. Defendant is subject to personal jurisdiction because it has sufficient minimum contacts with California. Defendant is subject to jurisdiction under California's "long-arm" statute found at California Code of Civil Procedure § 410.10 because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States." Indeed, Plaintiff believes that Defendant generates a minimum of eight percent of its national website sales to Californians, such that the Website "is the equivalent of having a brick-and-mortar store in California – a 'virtual store.'" *Thurston v. Fairfield Collectibles of Georgia, LLC*, 53 Cal. App. 5th 1231, 1240 (2020) (citing *Stomp, Inc. v. NeatO, LLC*, 61 F. Supp. 2d 1074, 1078 n.7 (C.D. Cal. 1999)). Since this case involves wrongdoing related to the operation of Defendant's Website, which functions as an online store selling goods and products including

coffee and related brewing accessories, California courts can "properly exercise personal jurisdiction" over Defendant in accordance with the Court of Appeal opinion in *Thurston v. Fairfield Collectibles of Georgia, LLC*, 53 Cal. App. 5th 1231, 1237-42 (2020).

### III. PARTIES

4. Plaintiff is a resident and citizen of California. In August 2022 while physically within California, Plaintiff visited Defendant's Website using a smart phone and conducted a brief conversation with an agent of Defendant through the Website's chat feature. Plaintiff was not advised that the chat was monitored, intercepted, or recorded, nor did she consent thereto.

5. Defendant is part of a publicly traded American coffee and beverage conglomerate, Keurig Dr Pepper, Inc., with its headquarters in Burlington, Massachusetts. It manufactures and sells over 125 beverages throughout the United States and in this District. With annual net sales of over $14 billion, Defendant is part of a conglomerate constituting one of America's largest specialty retailers.

6. Defendant owns, operates, and/or controls the Website.

### IV.   FACTUAL ALLEGATIONS

**A.   Background of CIPA**

7. CIPA prohibits both wiretapping and eavesdropping of electronic communications without the consent of all parties to the communication. "'[T]he right to control the nature and extent of the firsthand dissemination of [one's] statements'" is viewed by the California Supreme Court "as critical to the purposes of Section 631[.]" *Javier v. Assurance IQ, LLC*, 2023 WL 114225, at *6 (N.D. Cal. Jan. 5, 2023) (Breyer, J.) (quoting *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985)); *Ribas*, 38 Cal. 3d at 360-61 ("a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device"). "[U]nder Section 631, it has always mattered who is holding the tape recorder[.]" *Javier*, 2023 WL 114225, at *6.

8. Compliance with CIPA is easy, and most website operators comply by conspicuously warning visitors if their conversations are being recorded, intercepted, or eavesdropped upon.[1]

---

[1] https://www.leechtishman.com/insights/blog/the-california-invasion-of-privacy-act-californias-wiretap-act/ ("[C]ompliance [with CIPA] is not difficult. A business must take certain steps, as part of its privacy program, to ensure that **any time the business is gathering**, either automatically, or **with a chat feature**,
Continued on the next page

9. Unlike most companies, Defendant *ignores* CIPA. Instead, Defendant enables and allows a third party that has no corporate affiliation with Defendant to eavesdrop on all such conversations. Why? Because, as one industry expert notes, "*Live chat transcripts are the gold mines of customer service. At your fingertips, you have valuable customer insight to make informed business decisions. . . .***When people are chatting, you have direct access to their exact pain points.**"). See https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts (last visited May 16, 2023) (emphasis added).

10. Defendant's actions are not incidental to facilitating e-commerce, nor are they undertaken in the ordinary course of business. To the contrary, as noted above, Defendant's actions violate industry norms and the legitimate, reasonable expectations of consumers.

**B.     Defendant Allows Oracle to Intercept Consumers' Chats During Transmission**

11. To enable the eavesdropping, Defendant has allowed a third party, Oracle, to covertly embed its Oracle CX chat technology code designed by "RightNow Technologies," into Defendant's chat feature. Indeed, as shown below, whenever a consumer chats via Defendant's Website, the chat is routed *through* www.rightnowtech.com:



12. In other words, before the chat even gets to Defendant, Oracle intercepts it, copies it, and forwards it along to Defendant. The chats meant for Defendant are first routed *through* Oracle. The communication from a consumer, and transmitted through Oracle to Defendant, are not encrypted.

---

***personal data of a consumer/website visitor****, **that it obtains valid consent consistent with the holdings and determinations of the courts interpreting CIPA** and other applicable Data Privacy laws.*") (last visited May 11, 2023) (emphasis added).

```
Headers  Payload  Preview  Response  Initiator  Timing
▼ Query String Parameters    view source    view decoded
    pool: 21752:2
▼ Request Payload    view source
  ▼{body: "I was wanting to get a reusable pod/filter", clientRequestTime: "2023-05-19T20:09:21.314Z",…}
     body: "I was wanting to get a reusable pod/filter"
     clientRequestTime: "2023-05-19T20:09:21.314Z"
     messageId: "1684526961306"
     offTheRecord: false
```

13. As shown above, the secret code is a type of automatic routing software that automatically acquires and transmits user chat communications to Oracle without any active input from either Defendant's employees, agents, or human representatives, or Oracle's employees, agents, or human representatives. Oracle acquires Website visitors' chat communications by first having the Oracle CX software route them to Oracle's own computer servers that it owns, controls, and maintains. The secret code enables and allows Oracle to secretly intercept in real time, eavesdrop upon, and store transcripts of consumers' chat communications they *think* they are having with Defendant, even when such conversations may be private and personal. Defendant neither informs visitors of this conduct nor obtains their consent to these intrusions.

14. One might reasonably wonder why Oracle would be interested in intercepting and recording the Website chat interactions between Defendant and unsuspecting visitors to Defendant's Website. As shown below, it all about money.

15. The Oracle CX software is integrated with social media platforms like Facebook: "Oracle RightNow Social Experience enabled brands to harness consumer influence and passion in service of the brand. It extended your customers' experience to the places where consumers are learning, sharing, and buying across social media including social media monitoring branded online communities, and a full-service Facebook experience." *See* https://www.oracle.com/cx/service/rightnow/ (last visited May 31, 2023).

16. Oracle admits to its real-time data collection from its clients' (like Defendant) users: "Oracle RightNow Analytics Cloud provided actionable insights, empowering frontline workers to make better and quicker decisions. Fully integrated across all Customer Experience (CX) products, Oracle delivers full visibility across all customer touchpoints, spanning customer service, sales, marketing, and feedback functions. **Oracle Analytics provides visibility across all interaction channels by capturing, organizing, presenting, and *disseminating real-time actionable knowledge* with speed and**

**flexibility**…. Today's customers demand new experiences driven by personalized channels and choices. Each customer journey is unique, but you need to ensure each experience is seamless and personalized. Leverage best-of-breed CX solutions by channel or bring them together into a connected engagement through data, behavioral intelligence, and experiences across all lines of business. *See* https://www.oracle.com/cx/service/rightnow/ (last visited May 31, 2023) (emphasis added).

17. Oracle acquired the now Oracle CX software from RightNow Technologies which boasted that the software "allowing companies to monitor and interact with customers via Facebook from RightNow CX, a customer experience suite. RightNow CX for Facebook gives companies the opportunity to provide exceptional customer service experiences to those eager to engage with a brand on Facebook fan pages." *See* https://www.destinationcrm.com/Articles/CRM-News/CRM-Featured-News/RightNow-Launches-RightNow-CX-for-Facebook-70083.aspx?CategoryID=263 (last visited May 31, 2023). The software "enables organizations to: Answer questions directly from the agent desktop[;] Capture all Facebook interactions in the unified customer record[;] Monitor and respond to posts on on [*sic*] the company's Facebook wall[;] Moderate the conversation on thee [*sic*] company's Facebook page[;] Track and report on activity in Facebook." (*Id.*)[2]

18. The foregoing shows that Oracle's chat software is "integrated" with Meta, Inc.'s subsidiaries like Facebook and WhatsApp. The integration allows various software sub-systems to share data to operate as a unified system. According to Bloomberg.com, this is all part of Meta's secret "***plan to profit from private chats.***" As Bloomberg explained, Meta's software integration "*can manage customer messages from multiple services on one central dashboard. That's central to Meta's plan to make money off of its two messaging apps, WhatsApp and Messenger.*" *See* https://www.bloomberg.com/news/articles/2022-02-15/meta-closes-1-billion-kustomer-deal-after-regulatory-review (last visited May 31, 2023) (emphasis added).

19. So how does it work? ***First***, Meta identifies "user interests" by monitoring a collection of

---

[2] Further, "'What [RightNow is] trying to do is to give the user the option to find the answer to their question in the manner that they want to engage with the company - either via community opinion, or through a search in a knowledgebase or through direct interaction with an agent," says Kate Leggett, senior analyst of customer service and call center processes at Forrester. "My take is that it's customer service on the customer's terms, but within the umbrella of the customer service offerings from the company.' RightNow CX for Facebook hopes to give organizations an opportunity to abolish silos, integrating information obtained through Facebook to better understand the customer experience." (*Id.*)

"offsite" user activity such as website visits and interactions (including private chat communications between Defendant and visitors) by "integrating" its software with Oracle's software. **Second**, Meta generates revenue by selling advertising space through its subsidiaries' ability to identify those offsite user interests. **Third and finally**, after the chat transcripts intercepted by Oracle are provided to Meta through "integration", Meta brands like Facebook and WhatsApp bombard the unsuspecting Website visitors with targeted advertising based upon the user's Website visits and interactions.

20. Through the preceding acts, Meta subsidiaries can freely boast that they can "Transform your support center into a profit generator by bulk messaging specific customer segments based on your unique data…to reengage dissatisfied customers."  *See* https://www.kustomer.com/product/customer-service/ (last downloaded May 16, 2023).  Indeed, all of the schemers – Defendant, Oracle, and Meta – all profit from secretly exploiting the chat data through targeted social media advertising because "*Targeted advertising allows brands to send different messaging to different consumers based on what the brand knows about the customer. The better a brand can demonstrate that it understands what its customers want and need, the more likely customers respond to advertising and engage with the brand. . . . Social media targeting helps brands leverage consumers' behavior on the web, search engines, and social media sites to present ads that reflect consumer interests.*"  *See* https://www.adroll.com/blog/what-is-targeted-advertising#:~:text=Targeted%20advertising%20allows%20brands%20to,and%20engage%20with%20the%20brand (last visited May 16, 2023).

21. As such, Oracle does more than merely provide a storage function for Website users' chat communications with Defendant.  It is more than the proverbial "tape-recorder" in the hand of Defendant.  Instead, Oracle uses its record of Website users' interaction with Defendant's chat feature for data analytics and marketing/advertising to consumers.  Oracle's exploitation, monetization, use of, and interaction with the data it gathers through the chat feature on Defendant's Website in real time makes it a third-party interceptor and eavesdropper known to and enabled by Defendant under section 631(a), rather than a mere extension of Defendant and/or party to the communication with Website visitors.

22. Given the nature of Defendant's business, visitors may share personal and confidential data and personally identifying information with Defendant via the Website chat feature.

23. Defendant did not inform Class members that Defendant was secretly allowing, aiding, and abetting Oracle to intercept and eavesdrop on the conversations during transmission, or that Oracle provided data from such transcripts to Meta and similar entities through "integration" of their softwares.

24. Defendant did not obtain Plaintiff's or the Class members' express or implied consent for the preceding intrusions, nor did Plaintiff or Class members know at the time of the conversations of Defendant's conduct.

## CLASS ALLEGATIONS

25. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons within the state of California who within the statute of limitations period: (1) communicated with Defendant via the chat feature on Defendant's Website; and (2) whose communications were recorded and/or eavesdropped upon without prior consent.**

26. NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

27. COMMONALITY: Common questions of fact and law exist as to all Class members, and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

   a. Whether Defendant aided and abetted a third party in eavesdropping on such communications;
   
   b. Whether Plaintiff and Class members are entitled to statutory penalties; and
   
   c. Whether Class members are entitled to injunctive relief.

28. TYPICALITY: As a person who visited Defendant's Website and whose electronic communication was recorded, intercepted and eavesdropped upon, Plaintiff is asserting claims that are typical of the Class.

29. <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

30. <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## CAUSE OF ACTION

## Violations of the California Invasion of Privacy Act

## Cal. Penal Code § 631(a)

31. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

32. "Any person who, by means of any machine, instrument, or contrivance, or in any other manner,… [ii] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine . . . ." *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1080 (C.D. Cal. 2021) (Holcomb, J.) (line breaks and headings of clauses added for ease of reference) (quoting Cal. Penal Code § 631(a)).

33. Clauses ii through iv of section 631(a) of the California Penal Code applies to internet communications and thus applies to Plaintiff's and the Class's electronic communications with Defendant's Website. "Though written in terms of wiretapping, Section 631(a) applies to Internet communications. It makes liable anyone who 'reads, or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.'" *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. 2022); *Yoon*, 549 F. Supp. 3d at 1080 ("Courts agree … that CIPA §

631 applies to communications conducted over the internet.") (citing *Matera v. Google Inc.*, 2016 WL 8200619, at *18 (N.D. Cal. Aug. 12, 2016) (Koh, J.) (holding that second clause of section 631(a) "encompasses email communications, which pass over wires, lines, or cables")); *In re Google Inc. Gmail Litig.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013) (Koh, J.) ("the Court finds that section 631 of CIPA applies to emails"); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 826 (N.D. Cal. 2020) (Labson Freeman, J.).

34. Oracle's software embedded on Defendant's Website to record and eavesdrop upon the Class's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein. *See In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 937 (N.D. Cal. 2015) (stating that "***it is undeniable that a computer may qualify as a 'machine'***" within the meaning of section 631(a)) (emphasis added), *aff'd in part and rev'd in part on other grounds*, 956 F.3d 589 (9th Cir. 2020).

35. At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Class members with Defendant's Website to be recorded. Defendant also aided and abetted, agreed with, employed, or conspired with at least one third party to wiretap and/or eavesdrop upon such conversations during transmission and in real time by voluntarily embedding Oracle's software code on Defendant's Website.

36. Defendant knows that Oracle, through software, captures the electronic communications of visitors to Defendant's Website, and pays it to conduct these activities.

37. Plaintiff and Class members did not expressly or impliedly consent to any of Defendant's or Oracle's actions.

38. In a materially identical case, a court recently held that the above-described allegations state viable claims for violations of section 631(a) of CIPA. *See Byars v. The Goodyear Tire & Rubber Co.*, No. 5:22-cv-01358-SSS-KKx, 2023 WL 1788553, at *4 (C.D. Cal. Feb. 3, 2023) (Sykes, J.) ("*Byars contends that Goodyear, using a third-party service, "intercepts in real time" a website visitors' chat conversation. . . . Byars alleges that, using the chat conversation, website visitors share sensitive personal information. . . . . Because Byars has pled sufficient facts to show the contents of the communications and*

*that the communications were intercepted, Byars has sufficiently stated a claim under § 631(a).")* (emphasis added).

39. Defendant's conduct constitutes numerous discrete violations of Cal. Penal Code § 631(a), entitling Plaintiff and/or Class members to injunctive relief and statutory damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class counsel;
2. An order declaring Defendant's conduct violates CIPA;
3. An order of judgment in favor of Plaintiff and the Class and against Defendant on the causes of action asserted herein;
4. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;
5. Statutory damages pursuant to CIPA;
6. Reasonable attorneys' fees and costs; and
7. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated: June 6, 2023            PACIFIC TRIAL ATTORNEYS, APC


By: */s/ Scott J. Ferrell*
Scott. J. Ferrell
Attorneys for Plaintiff

1

**CERTIFICATE OF SERVICE**

2   I hereby certify that on June 6, 2023, I electronically filed the foregoing SECOND AMENDED
3   CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY
4   ACT ("CIPA") with the Clerk of the Court using the CM/ECF system which will send notification of such
5   filing via electronic mail to all counsel of record.

7   Dated:  June 6, 2023

*/s/ Scott J. Ferrell*
Scott J. Ferrell